Halsam Products Company v. Commissioner.
Halsam Prods. Co. v. Commissioner
Docket No. 26044.
United States Tax Court
1952 Tax Ct. Memo LEXIS 339; 11 T.C.M. (CCH) 87; T.C.M. (RIA) 52023; January 29, 1952
*339 Upon the record, it is held that the petitioner's lease of property upon which it erected a building is one for a fixed term of 10 years without privilege of renewal, and the useful life of the improvement being in excess of the term of the lease, its cost to petitioner is subject to amortization over the remaining term of the lease. It is further held that the cost to petitioner of the erection of a partition in its general offices in construction of a private office was a capital expenditure subject to recovery through depreciation. Daniel A. Taylor, Esq., 135 S. LaSalle St., Chicago 3, Ill., and John F. Kelly, Jr., Esq., for the petitioner. Paul Levin, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined *340 deficiencies in income tax for the fiscal years ended November 30, 1946 and 1947 in the amounts of $5,040.63 and $7,071.31 respectively, and excess-profits tax for the fiscal year ended November 30, 1946 in the amount of $1,052.64. The issues are: (a) Should the cost to the petitioner of an improvement on a leasehold be amortized over the remaining life of the lease or the life of the improvement; and (b) Should the cost of a partition erected by petitioner in its factory building be treated as a repair or a capital expenditure. Four additional assignments of error made in the petition have been settled by agreement of the parties. Some of the facts are stipulated and are so found. Findings of Fact The petitioner, Halsam Products Co., is an Illinois corporation with place of business at Chicago, Illinois. Its returns for the taxable years here in question were filed with the collector of internal revenue for the district of Illinois. At all times material hereto, petitioner had outstanding 3,000 shares of common stock of the par value of $100 per share, this stock being owned as follows: Sam G. Goss (President)
1,000 shares
Mildred H. Goss
450 shares
Harold H. Elliott, Sr. (Treasurer)
1,000 shares
Hazel G. Elliott
550 shares
*341 Mildred H. Goss is the wife of Sam G. Goss and Hazel G. Elliott is the wife of Harold H. Elliott, Sr., and a sister of Sam G. Goss. The petitioner is a manufacture of embossed wood products, chiefly toy ABC blocks, checkers, dominoes, etc. Since all such products are staple items, the company has been able to plan its production on a year-round basis, though its deliveries are concentrated within a period of a few months. Usually orders are obtained in November and December and deliveries are made from August to November of the following years. This condition creates a serious storage problem for petitioner, as these manufactured products are necessarily stored for a considerable period before delivery. This condition also necessitates that petitioner maintain a substantial working capital, since its costs for raw material and labor are expended throughout the year, whereas its collections are not made until the close of the year. Since its organization in 1917, petitioner has followed a definite policy of carrying on its business in rented properties and thus not tying up its capital in real estate. The factory building which it now occupies was built for it by Sam G. Goss, Sr. *342 , the father of its present president, and leased from him by petitioner. It is now leased by petitioner from the trust estate created under the will of Sam G. Goss, Sr. Prior to 1945 the petitioner secured storage facilities which were needed in its business at different locations, some of which were more than three miles from its factory building. Petitioner did not own and operate a trucking service for its material, but hired trucks when needed. Its raw material had to be brought from its rented storage warehouses to the factory and the finished material transferred to such warehouses for storage. This arrangement was unsatisfactory because it was too expensive and inefficient. In 1944 a property about one and a half blocks from petitioner's factory, belonging to the Moulding Estate, came on the market. There was a railroad siding on this property. Part of the property was occupied by storage sheds which could be used for petitioner's purposes and at that time were being rented by petitioner. For some years prior to this, petitioner had recognized the fact that it was imperative that it vacate its factory building and move to some other location where it could have a manufacturing *343 plant including storage space built for it by some investment or insurance company. The factory building then and now occupied by petitioner was three stories in height, requiring that its raw material be carried to the third floor and then brought down through a series of manufacturing operations to the floors below. Such a manufacturing plant could be much more economically operated in a one-story structure with storage space at one end for raw material, from which point it would move through the building in stages of manufacture to the storage facilities at the opposite end of the building. Prior to 1945, in view of these conditions, petitioner had secured an option on land at Skokie, Illinois. It considered the erection of a building on this land but was discouraged because of the labor cost and difficulty of obtaining material. It was thought that these costs would later decrease, and the plan was temporarily set aside. Accordingly, when the property of the Moulding Estate, close by petitioner, came on the market for sale, petitioner's two main stockholders, Sam G. Goss and Harold H. Elliott, Sr., personally purchased the property and caused it to be conveyed to the Northern *344 Trust Co., as trustee under a trust fund instrument, the beneficiaries being their wives and children. Thereupon petitioner leased the premises from the trust for its storage purposes. Shortly thereafter these premises were destroyed by fire when practically filled to capacity with raw materials. Petitioner was thereupon faced with the necessity of obtaining storage facilities as quickly as possible. It could not rebuild the storage sheds which had been destroyed by fire with similar sheds since structures of this kind were not then permitted by the City of Chicago to be erected at this point. After considering the conditions facing it, the petitioner consulted an architect, who estimated the cost of replacing the storage facilities on the trust property with a concrete and brick building complying with the City laws, and petitioner's accountant computed the cost to petitioner of its maintenance of its rented storage facilities at various points. It was then determined that the cost of erection of a storage warehouse on the site of the sheds destroyed, of a character permitted by the City, would approximate the cost to it of renting necessary storage facilities over a period of 10 *345 years. It was then decided by petitioner to erect the building and amortize its cost over a 10-year period. A formal lease was procured on September 1, 1945 from the trust for a term of 10 years. The cost of the building to the petitioner as of June 1, 1946 was $156,878.47, and as of December 1, 1946 was $157,646.65. It consists of a two-story building of brick and concrete construction. In its tax returns for the fiscal years 1946 and 1947 here involved petitioner deducted from income the respective amounts of $16,090.10 and $16,178.88, as amortization of the cost of the building over a 10-year term, or 117 months from December 1, 1945. In determining the deficiency, respondent has disallowed the deductions for amortization and has allowed depreciation on the building at an annual rate of 2 1/2 per cent. The lease on the property to petitioner for a period of 10 years, executed September 1, 1945, was at a rental of $200 per month plus the payment by the lessee of taxes, insurance and other expenses. The lease provided for the return of the property by petitioner to the lessor at the expiration of the 10-year term. There was no provision granting an option to petitioner to renew *346 for an additional term. However, the trust indenture under which the property was conveyed to the Northern Trust Co. as trustee provided, inter alia, as follows: "(f) While The Northern Trust Company is the sole owner of the property covered hereby, and, so far as third parties are concerned, has full power to deal with it, it is understood and agreed by all present or future beneficiaries hereunder that said The Northern Trust Company will deal with said property only when authorized so to do in writing and that it will (notwithstanding any change in any beneficiary hereunder, unless otherwise directed in writing by the beneficiaries) on the written direction of Harold H. Elliott and Sam G. Goss or on the written direction of such person or persons who may be beneficiaries at the time, or who may be named by such beneficiaries, make deeds for or otherwise deal with the title to said real estate, provided, however, that the Trustee shall not be required to enter into any personal obligation or liability in so doing and further shall not be required to make any conveyances or other instrument effecting [effective] said real estate while money is owing to it as Trustee hereunder. *347 " On September 1, 1945, when the aforementioned 10-year lease was executed, the volume of petitioner's business was increasing rapidly and a further large increase was reasonably expected which would overload its facilities for manufacture at its then location. Subsequent events have justified this anticipation. At the time of the hearing of this proceeding petitioner's plant was working at full capacity, it being necessary at times to employ a night shift. There was no additional room in its factory building to install additional machinery, of which it was in acute need. The location of the factory was zoned for use in light manufacturing. There were many residences nearby. As a result of its employment of a night shift it was in constant trouble with the police department by reason of complaints with respect to noise at night and dust disseminated over the neighborhood. In addition to that a situation which long troubled petitioner had become acute. This condition was that petitioner's shipping entrance, also used for receiving raw materials, was on an alley at the rear of the building. That building was flush with the alley line. Across this alley was another manufacturing plant *348 whose entrance was opposite that of the petitioner. This latter plant was set back from the alley line but the property to such line was owned by that plant and because of the narrowness of the alley it was necessary for petitioner to encroach upon it in the receipt and shipment of material. This condition was objectionable to the factory thus encroached upon, which threatened petitioner with the erection of a fence which would interfere seriously with petitioner's operations. In view of these conditions facing petitioner on September 1, 1945, and reasonably anticipated, there was no reasonable expectation on its part that the storage facilities which it contemplated erecting on the leased property would be used by it for a period beyond the term of the lease. Moreover the cost of the storage facilities to be erected was approximately the same as the cost which petitioner would be forced to meet if it continued to rent storage space at various locations as it had done in prior years. The lease was not for an indefinite or indeterminate period but was a lease for a period of 10 years from September 1, 1945. In 1946 petitioner had in its general offices two private offices separated *349 by an open space between, which was occupied by its bookkeeper. This open space did not provide the privacy required for the keeping of its records. Petitioner in that year erected a wall or partition extending to the ceiling and connecting with the front walls of each of the private offices, making a third private office of this open space. In such wall or partition there was built a full-sized door. The walls of such partition were in part of ground glass and the construction was such as to have a life of 10 years. Petitioner, in its return for 1946, deducted the cost of this partition as an expense attributable to such year. In determining the deficiency, respondent has capitalized this expenditure and allowed depreciation on the basis of a useful life of 10 years. Opinion The principal issue is whether petitioner is entitled to amortize the cost of a storage warehouse it erected on leased property over the term of the lease or whether the cost of this improvement is to be recovered by depreciation over the useful life of the improvement. The rule is clear, as the parties agree. Where improvements are made by a lessee on leased property held under a lease for an indeterminate *350 period, recovery of cost must be by depreciation over the useful life of the property. Where, however, the lease is for a definite period with no option for renewal, the cost of the improvement is to be amortized over the remaining term of the lease. In case the lease grants to the lessee a right of renewal or extension, the question as to whether the recovery of the expenditures shall be by amortization over the original term of the lease, or over the life of the property if such is longer than the lease term, depends upon the facts in the particular case. Unless the lease has been renewed or such facts show with reasonable certainty that it will be renewed, the cost of the improvement is permitted to be recovered over the number of years only the lease has to run, without taking into account a right of renewal. ; ; . Regulations 111, sec. 29.23 (a)-10. [1]
*351 The contention of respondent is that the lease here was for an indeterminate period, with the cost of the storage warehouse to be recovered through depreciation over the useful life of the improvement. It is petitioner's position that the lease was for a definite period without an option of renewal and that, in addition to this fact, there was not at the time of the execution of the lease, nor has there been at any time since then, a reasonable expectation that petitioner would even desire to occupy the premises for a period longer than the lease term of 10 years. In support of his contention respondent calls attention to the fact that the property here belongs to a trust, the beneficiaries of which are the wives and children of petitioner's two officers who, with their wives, own petitioner's stock, and that the provisions of the trust instrument are such that they give these two officers of petitioner the power to extend the lease period, if they so desire, by merely giving a direction to that effect to the trustee. Under such conditions, respondent argues, the lease term must be considered as indefinite or indeterminable. The answer to respondent's argument seems clear. *352 The lease, by its specific terms, grants to the petitioner the right to use the premises for a period of 10 years only, at the end of which term the property, together with the improvements erected, are to be returned to the trustee, upon which they will be held for the benefit of the beneficiaries. We do not agree that the conditions of the trust make the lease one for an indefinite period. At most it may be said that the terms of the trust are such that if petitioner should desire to use the property for a period longer than the 10 years specified in the lease, it has, for all practical purposes, the power to secure a new lease for an additional term from the trust. It should be kept in mind, however, that such a lease for an additional time would not be merely a ground lease at the present rental of $200 per month plus taxes and insurance, but one at a rental in the amount of the fair rental value of the entire property including the improvements in question. The authority, granted to petitioner's officers by the trust instrument, to give directions to the trustee does not empower these individuals to act against the beneficiaries of the trust, some of whom have no interest in the *353 petitioner corporation. Respondent cites , aff'd ; , aff'd . We think neither of these cases is in point. Each involved transactions found to be a mere contrivance or sham to secure a tax benefit, without a legitimate business purpose in the interest of the corporate taxpayer. Here the contrary is established. It is true that the lease was to petitioner by the trustee holding the title to the property for the benefit of the wives and children of the petitioner's two officers and principal stockholders. However, the terms of the lease and the conditions faced by the petitioner leading to its determination to construct this warehouse to meet a very urgent and imperative need would, we think, justify this transaction as for purely legitimate business purposes. Thus, we have found, at the time of the execution of this lease the conditions facing the petitioner were such that there was no reasonable certainty that petitioner would occupy the premises longer than the term of the lease. We hold that respondent was in error in treating the *354 lease as for an indefinite period and requiring the recovery of the cost of the improvements over the term of their useful life. Petitioner is entitled to recover such cost over the remaining term of the lease. The parties have stipulated the deduction to which petitioner is entitled for each year upon such basis. We have set out in our findings the facts pertaining to petitioner's construction of a partition or wall in its general offices, whereby it made an additional private office. We think that under the facts this constituted a physical addition to the premises and had a life of not less than 10 years, and that its cost constituted a capital expenditure. Respondent is sustained upon this issue. . The agreement of the parties on the other four issues raised by the petition will be reflected upon recomputation of the deficiency. Decision will be entered under Rule 50. Footnotes
1. REGULATION 111. Sec. 29.23(a)-10. Rentals. - * * * The cost borne by a lessee in erecting buildings or making permanent improvements on ground of which he is lessee is held to be a capital investment and not deductible as a business expense. In order to return to such taxpayer his investment of capital, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease, and such deduction shall be in lieu of a deduction for depreciation. If the remainder of the term of lease is greater than the probable life of the buildings erected, or of the improvements made, this deduction shall take the form of an allowance for depreciation. In cases in which the lease contains an unexercised option of renewal, the matter of spreading such depreciation or amortization over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renwed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal. * * *↩